UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH<br><br>hectorcedeno94@icloud.com<br><br>THAT IS STORED AT PREMISES CONTROLLED BY APPLE, INC. | Case No. 2:20-mj-328-JHR |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Tyler Martin, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with the following Apple ID: hectorcedeno94@icloud.com ("SUBJECT ACCOUNT) #1 that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

2. I am a sworn law enforcement officer for the Lewiston Police Department, and have been for approximately eight years. I am currently assigned as a task force officer with the Drug Enforcement Administration (H.I.D.T.A) task force. I am a graduate of the 21st class of the Maine Basic Law Enforcement Training Program. I am a graduate of the Maine Drug Enforcement Investigation School. I am also a graduate of the Bureau of Alcohol, Tobacco

Firearms, and Explosives Under Cover Operations course. I am a recent graduate of the Drug Enforcement Administration (DEA) Basic Narcotics School. I also recently attended the DEA Money Laundering Seminar no.60.

3. In the course of my law enforcement training and experience, I have had the opportunity to observe, search for, seize, and chemically field test numerous types of illegal drugs. I am familiar with the packaging, paraphernalia, pricing structure, distribution methods, and street jargon associated with the sale and use of scheduled drugs. I have gathered information and intelligence related to drug investigations, prepared and participated in the execution of numerous search warrants and debriefed individuals charged with various drug offenses. My participation in these drug investigations has contributed to the apprehension, prosecution and conviction of numerous individuals for unlawful trafficking, furnishing, cultivating, and possession of scheduled drugs.

4. My training and experience has included investigating crimes facilitated by the use of wire and electronic communication devices, including the trafficking of firearms and narcotics, and the use of cellular telephones in connection with investigations into such conduct. In particular, I have received training concerning the review of digitally-stored information to identify evidence of a crime, including the locations of individuals involved in a criminal scheme, the identities of coconspirators.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846 and 841 (narcotics trafficking) have been committed, are being committed, and will be committed by Hector Cedeno, (hereinafter "Cedeno") and others not yet known, as described in Attachment B.

## JURISDICTION

7. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

8. The United States, including the DEA, is conducting a criminal investigation of Cedeno and others not yet known, regarding possible violations of Title 21, United States Code, Sections 846 and 841 (narcotics trafficking) (the "SUBJECT OFFENSES").

9. As set forth below, based on my participation in the investigation to date, I am aware that in the course of committing the SUBJECT OFFENSES, Cedeno has sold and continues to sell cocaine base, heroin, and fentanyl in Maine and communicated over a cellular telephone that is linked to SUBJECT ACCOUNT #1, concerning the SUBJECT OFFENSES.

10. In July 2020, I and other agents met with a Confidential Source[1] (hereinafter "CS-1") after CS-1 contacted me to say that he/she had made contact with a male drug trafficker in

---

[1] CS-1 has criminal history including state felony drug offenses, driving offenses, and other misdemeanor offenses. CS-1 does not have any pending charges and is cooperating with law enforcement in hopes of monetary compensation. CS-1 has provided law enforcement with information deemed creditable in the past, which led to arrests and seizures of illegal narcotics. CS-1 advised me in July 2020 that he/she could purchase drugs from "Hector."

3

Lewiston, Maine named "Hector." During my meeting with CS-1 he/she stated that Hector's phone number was 207-405-9857 and he used a Facebook account with the name "Hexstone Hexstone."[2]

11. CS-1 further stated that during his/her first meeting with Hector, he offered to sell him/her both "up and down" so that CS-1 could resell the product to make money. Based on my training and experience, I know that "up and down" are street jargon used by both drug traffickers and users referring to cocaine/cocaine base and heroin/fentanyl.

12. CS-1 was able to identify Hector's residence as 15 Webster Street, Lewiston, Maine. CS-1 stated that Hector's apartment was on the first floor.

13. After debriefing CS-1, I drove past 15 Webster Street[3] and observed a white Jeep Wrangler parked in the driveway on the 15 Webster Street side of the building. A male subject was speaking to the driver of the Jeep, and I was able to identify the male subject as Cedeno.

14. On September 3, 2020, Task Force Officer Thomas Lapierre and I met CS-1 to develop a plan to purchase heroin/fentanyl from Cedeno. CS-1 spoke with Cedeno via text messages at 207-405-9857 (hereinafter "Target Telephone 1" or "TT1"). The controlled purchase was set to take place at Cedeno's residence, 17 Webster Street in Lewiston, Maine.

15. Based on my review of the text messages between CS-1 and Cedeno via TT1, I believe Cedeno agreed to sell CS-1 eight (8) grams of heroin/fentanyl for $400.00. CS-1 and Cedeno agreed to meet "around 3-4…"

---

[2] I am familiar with the individual that held the above mentioned Facebook account and knew it to be Hector Cedeno. During my time with the Lewiston Police Department I have had prior police contacts with Cedeno and I was able to positively identify him from the Facebook profile provided by CS-1.
[3] While driving by 15 Webster Street, I noticed that this was a multi-unit apartment building and had the number 15 and 17 affixed to the side of the building.

16.     At approximately 4:03 p.m., and in anticipation of the controlled purchase with Cedeno, I searched CS-1 and did not locate any contraband. TFO Kyllonen searched CS-1's vehicle and did not locate any contraband.

17.     At approximately 4:04 p.m., I gave CS-1 prerecorded U.S. Currency to complete the purchase. TFO Lapierre then equipped CS-1 with an electronic recording and transmitting device (E.R.T.D), which allowed surveillance units to monitor CS-1's conversations during the controlled purchase.

18.     At approximately 4:10 p.m., CS-1 left the predetermined meet location, and began traveling toward Cedeno's residence. CS-1 was followed by myself and TFO Lapierre. At approximately 4:18 p.m., I observed CS-1 pull into the driveway of 17 Webster Street. Approximately 30 seconds later I could hear CS-1's car door open and close. During the controlled purchase there was no conversation heard over the E.R.T.D. About three minutes later, I observed CS-1 approach their vehicle and open the door. As CS-1 was pulling out of Cedeno's driveway, a red sedan bearing Maine registration THTBXCH pulled into the driveway, and had to back out to allow CS-1 to leave. CS-1 left Cedeno's residence and began travelling to the meet location. I followed CS-1. After the transaction was complete, I reviewed the audio of the transaction and could hear CS-1 having a brief conversation with a male voice that CS-1 later confirmed was Cedeno.

19.     After arriving at a predetermined location, CS-1 provided me with a clear plastic bag containing an off-white substance.  The substance weighed approximately 8.3 grams and was consistent in appearance with fentanyl and/or heroin that I have seized on other investigations.  Based on the dangerous nature of fentanyl it was sent to the DEA lab for further testing and safekeeping.

20. On September 14, 2020, DEA agents and CS-1 developed a plan to purchase heroin/fentanyl from Cedeno. Prior to the purchase, CS-1 had a series of text messages with Cedeno via TT1. In summary, Cedeno stated that CS-1 could purchase one "stick"[4] for $470.00 if CS-1 purchased three or more. CS-1 informed Cedeno that he/she had $2,500 and Cedeno replied that he had it already and confirmed that it would be "55" grams and the two agreed to meet later that afternoon. A summary of the relevant texts is transcribed below:

```
Cedeno (TT1): 47 a g if you get three or more
CS-1:        Huh 47 ??
Cedeno:      47 g
Cedeno:      Tha 470 for a stick
Cedeno:      And is good
CS-1:        Ok ty
Cedeno:      U can come get a sample
. . .
CS-1:        I can't wait around today can you do it without me needing to wait
CS-1:           . . .
Cedeno:      I got it ready
CS-1:        Perfect so what 56 for 2500
Cedeno:      55
Cedeno:      When u comin
Cedeno:      wen u comin
CS-1:        This Afternoon I'm heading that way shortly
Cedeno:      Is ready
CS-1:        Perfect I'm heading to that area now like 40 minutes away then I'm going
             to the bank and I'll be there appreciate it
```

21. At approximately 1:30 p.m., CS-1, Special Agent Katherine Barnard, and I met at a predetermined location where CS-1 and his/her vehicle were searched for contraband. No illegal contraband was recovered. CS-1 was provided with $2,500 of prerecorded U.S. Currency with the expectation that CS-1 would be purchasing 55 grams of heroin/fentanyl from Cedeno.

---

[4] Based on my training and experience, I know that the term "stick" is commonly used to refer to 10 grams.

22. At around this time TFO Barry Kelly and TFO Andrew Flynn established surveillance in the area of Cedeno's residence, 17 Webster Street, Lewiston, Maine.

23. CS-1 was fitted with an electronic monitoring device that allowed both audio and video recording. At approximately 1:43 p.m., CS-1, followed by additional surveillance units departed from the meet location and traveled to the area of 17 Webster Street. At approximately 1:51p.m., TFO Andrew Flynn observed CS-1's vehicle arrive and park in the driveway of 17 Webster and CS-1 exit his/her vehicle and walk towards Cedeno's residence. Approximately one minute later, TFO Flynn observed CS-1 enter his/her vehicle. Agents monitoring the transmitting/recording equipment, could then hear CS-1 make an outgoing call that went unanswered. A moment later, Agents could hear Cedeno call CS-1 and then CS-1 state that he/she was there. TFO Flynn then observed CS-1 exit his/her vehicle and walk back towards Cedeno's residence.

24. A few minutes after entering the residence, TFO Flynn observed CS-1 walk back to his/her vehicle. CS-1 subsequently departed the residence and met agents at a predetermined location. CS-1 provided TFO Lapierre with a clear wrapped package of an off-white powder. Based on my training and experience I, and other agents believed that the off-white substance Cedeno sold CS-1 may have a substantial amount of "cut".[5]

25. At approximately 3:00 p.m., at the direction of agents and in my presence, CS-1 paced a recorded call to Cedeno at TT1 to discuss his/her concern about the amount of "cut" that was used in the package he/she had received that day. In summary, during the call between CS-1

---

[5] "Cut" is a term that is used to describe adulterants or substitutes that are added to illegal narcotics as a bulking agent to mimic illegal narcotics.

and Cedeno, CS-1 asked Cedeno if there was substantial "cut" in the product, and told Cedeno that he/she would rather pay more for "uncut" product. Cedeno stated that he got it that way, and questioned if CS-1 had given it to anyone. Cedeno stated that CS-1 should give it to someone first, and that it can definitely be cut more. Cedeno added that his people have been giving it a "9."

26. A field-test of the off-white powder Cedeno sold CS-1 resulted in a positive presumptive test for heroin and fentanyl. The net weight of the powder tested was approximately 55 grams.

27. On October 15, 2020, DEA agents and CS-1 developed a plan to purchase $2,000 worth of cocaine base (commonly known as "crack cocaine) from Cedeno. Prior to the purchase, CS-1 had a series of text messages with Cedeno via TT1, where Cedeno agreed to sell CS-1 35 grams of crack cocaine for $2,000.

28. CS-1 and his/her car were searched prior to conducting the controlled purchase with Cedeno and CS-1 was provided with $2,000 in prerecorded U.S. Currency and outfitted with E.R.T.D. as well as an audio and video record device.

29. At approximately 1:26 p.m., CS-1 left the predetermined meeting location and traveled to Cedeno's residence. Agents observed CS-1 pull into Cedeno's driveway, get out of his/her vehicle, and then CS-1 could be heard speaking with Cedeno via the E.R.T.D.. After the short conversation with Cedeno, the transaction was completed and agents observed CS-1 returned to his/her vehicle, leave Cedeno's residence and return to the predetermined location. After arriving at the meeting location, CS-1 provided a clear plastic bag containing an off white substance to me. TFO Lapierre field-tested the substance that CS-1 purchased from Cedeno. The substance tested presumptively positive for the presence of cocaine base.

30.     At the conclusion of the controlled purchase, CS-1 informed me that when he/she arrived at Cedeno's residence to purchase the crack cocaine, Cedeno was waiting for CS-1 outside of the entry door to the apartment and was holding the product in his hand. CS-1further advised that the transaction took place in the common hallway of the building.

31.     Below are two images of Cedeno that were captured by the video recording device CS-1 was provided prior to the controlled purchase on October 15, 2020.  Image 1 is a picture of Cedeno in the common hallway of the building as described by CS-1 above. The second, is Cedeno with the package of crack cocaine in his hands prior to selling it to CS-1.





## Use of the SUBJECT ACCOUNT

## SUBJECT ACCOUNT #1
(hectorcedeno94@icloud.com – Cedeno)

32. As set forth below, I believe SUBJECT ACCOUNT #1 is used by Hector Cedeno who, as set forth above, has used a cellular phone to communicate in furtherance of the SUBJECT OFFENSES.

33. Based on my review of information obtained from Apple, I am aware that SUBJECT ACCOUNT #1 is linked to an Apple iPhone, which lisst the "contact name" as "Hector Cedeno" with a street address of 17 Webster Street, Lewiston, Maine[6] and 33 Winter Street, Lewiston, Maine.

34. The Apple records for SUBJECT ACCOUNT #1 show that "hectorcedeno94@icloud.com" is an email address connected to SUBJECT ACCOUNT #1 as the login email for SUBJECT ACCOUNT #1. I believe this email addresses is being used by Cedeno based on the following in sum, substance and in part:

   a. Based on my review of information obtained from Apple for SUBJECT ACCOUNT #1, I am aware that SUBJECT ACCOUNT #1 has enabled Apple devices connected to SUBJECT ACCOUNT #1 to sync "Calendars" and "Contacts," along with photographs, emails, "ICloud drive" to SUBJECT ACCOUNT #1 between January 1, 2020 and September 29, 2020.

---

[6] Based on information obtained from Apple, 17 Webster Street, Lewiston, Maine was identified as the address associated with the SUBJECT ACCOUNT #1 as of February 7, 2020.

Based on the foregoing, I believe Cedeno is the user of SUBJECT ACCOUNT #1 and has used SUBJECT ACCOUNT #1 in the course of the SUBJECT OFFENSES that that evidence of those crimes will be found in SUBJECT ACCOUNT #1. More specifically, I know that Cedeno used the telephone number (TT1) associated with SUBJECT ACCOUNT #1 to communicate with CS-1 for the controlled purchases that took place on September 3, 2020, September 14, 2020, September 25, 2020, and October 15, 2020.

### INFORMATION REGARDING APPLE ID AND iCLOUD[7]

35. Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

36. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

    a. Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

    b. iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages")

---

[7] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

   c. iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

   d. iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

   e. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

   f. Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

    g.  Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

    h.  App Store and iTunes Store are used to purchase and download digital content.  iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS.  Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

  37.  Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services.  A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

  38.  An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

  39.  Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including

the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

40. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

41. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC

address"), the unique device identifier ("UDID"), and the serial number.  In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com.  Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

42. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data.  Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive.  Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

43. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the

files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

44. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. For example, as set forth above, the conspirators have discussed drug quantity and drug type and have sent photographs of firearms over their cellular devices.

45. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

46. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account

may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

47. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

48. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

49. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

50. Based on the forgoing, I request that the Court issue the proposed search warrant.

51. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

52. The government will execute this warrant by serving the warrant on Apple. Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

53. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

_Tyler Martin_
Tyler Martin
Task Force Officer
Drug Enforcement Administration

Sworn to telephonically and signed electronically in accordance with the requirements of Fed. R. Crim P. 4.1

Date and Time:
11/23/2020, 2:04pm

City and State:
Portland, ME

John H. Rich III,
U.S. Magistrate Judge